STIRLEN v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. October 4, 1910. Petition for Rehearing Overruled November 18, 1910.)

No. 1,603.

CRIMINAL LAW (§ 695*)—TRIAL—EVIDENCE—LETTERS BETWEEN CO-CONSPIRATORS—SPECIFIC OBJECTION.

On the trial of a defendant, under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), for conspiracy to commit an offense against the United States, a letter passing between others of the alleged conspirators *held* competent against the defendant as tending to prove the conspiracy, in the absence of specific objection to the part of it referring to defendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1637; Dec. Dig. § 695.*]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

John Stirlen was convicted of a criminal offense, and brings error. Affirmed.

The case is stated in the opinion

Philip D. Clear and Wm. J. Custer, for plaintiff in error.

Edwin W. Sims, U. S. Atty., and Fletcher Dobyns, for the United States.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

GROSSCUP, Circuit Judge, delivered the opinion:

The conviction of plaintiff in error, in the Court below, was under section 5440 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3676), which makes it a crime for two or more persons to conspire to commit an offense against the United States—the offense charged in the indictment being the using of the mails in furtherance of a scheme to defraud. The conspirators named in the indictment were plaintiff in error, Thomas P. Daniels, alias Thomas E. Cameron, Frederick C. Struckmeyer and Isaac L. H. Holton—

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Daniels pleading guilty and Holton and Struckmeyer nolo contendere, —the latter two being sentenced to terms in the penitentiary.

The initial step in the scheme to defraud was an advertisement in the newspapers as follows:

"$125,000 or any part for investment in some good enterprise without services, T. E. Cameron, Central Building, Milwaukee."

The purpose being, that whoever was attracted by such advertisement, should be led to believe that to realize the proposed investment, it was necessary that they should organize corporations and issue bonds secured by trust deeds; the promoters of the scheme holding out that, under such circumstances they would sell the bonds to raise the money required by the victims. And the profit in the scheme was in the fees that the promoters received from the victims in the way of organizing the corporations, and in the way of going to and inspecting the properties upon which the bonds were to be issued; such so-called expenses and compensation being divided between the promoters of the scheme—the victims being turned off finally by some pretended obstacle purporting to make the loans undesirable. As an illustration of the care with which the ground was prepared to look encouraging at the start, but to carry no obligation for failure at the end, the following passage, in a so-called proposition from the imaginary investor to the inserter of the advertisement (to be shown, of course, to the proposed victim), is given:

"I will purchase these bonds provided the property is as represented and after an examination by an expert, the report of the expert discloses no disparaging comments upon the property of the company and upon the company and its personnel and prospective, the examination to be without cost to me."

The part charged against plaintiff in error, in the conspiracy, was that he was to act as the pretended trustee of the bonds; and that, in many cases, in pursuance of such conspiracy, he did act as such trustee, receiving certain sums of money in pretended compensation therefor.

The assignments of error relied on were:

(a) That there was not sufficient evidence to go to the jury to show plaintiff in error guilty of conspiracy; and

(b) That the Court erred in permitting certain evidence, offered by the Government, to go to the jury.

There was abundant evidence going to the jury that this was a conspiracy to commit the crime charged, and there was sufficient evidence to submit to the jury the question whether plaintiff in error, having in fact taken the part assigned to him in the indictment (on that there is no controversy), had taken such part conscious of its purposes. This assignment of error, therefore, may be dismissed without further comment.

It was the duty of the Government, of course, to prove guilty knowledge, and the substance of the second assignment of error is that a letter was permitted to go to the jury, written by one of the conspirators to another, in which it was stated, "I have now secured a new trustee" (referring to plaintiff in error), "who fully understands the whole proposition and is O. K. in every respect"; and that the tes-

timony of a post office inspector, detailing what was said to him by some of the conspirators other than plaintiff in error, was permitted to go to the jury, although at that time the operation of the conspiracy had been broken up by the arrest of the parties. Whether the conversations referred to were incompetent, we need not decide, for there was nothing whatever in them, so far as they related to plaintiff in error, that was prejudicial to him.[1]   Respecting the letter, from which

---

[1] William G. Means: Post Office Inspector located at Jacksonville, Ill., investigated the business of T. E. Cameron, I. L. H. Holton, Struckmeyer and John Stirlen.

Q. Which one of these men did you see first?
A. Mr. Struckmeyer.
Q. Where did you see him?
A. At his office in the Hartford Building this city.
Q. About when?
A. On the 13th day of September, 1906.
Q. What conversation did you have with him on that date?
A. I told Mr. Struckmeyer my name and occupation and informed him that I had received his complaint from the Tropical Fruit and Decorated Plant Company, that he had misled them concerning the purchase of certain bond issue, and I wanted to ascertain what he knew about the matter, why he did not take the bonds, when he agreed to purchase them and he said, I had such bonds under consideration and made a proposition to purchase them, but after examination was made I looked the matter over and the bonds were absolutely worthless. They had no property so I declined them. I asked him if he had purchased any other bonds from this same house of Cameron. He said he had not. But made an offer in two or three other issues, and told me that he would send me the names of these companies, which he did not do, and that was about all the conversation at that time.

Four or five days after the arrest of Mr. Daniels, otherwise Cameron, Inspector Bird and myself came to Chicago from Milwaukee and called upon Mr. Struckmeyer and had a conversation with him. He gave us the names of some six or seven bond companies that he had made proposals to purchase. He stated that he had found the security not ample in this case and could not afford to purchase them. He was expecting to purchase these bonds and sell them on the market making a margin. He denied that there was any collusion between him and Cameron and Holton in regard to the handling of these bonds.

Q. When did you first see Mr. Holton and where?
A. On the 13th day of September we went to Mr. Struckmeyer's office and Mr. Holton's office in the Reaper Block.
Q. Did you have any conversation with Mr. Holton?
A. We did.
Q. What was said?
A. We asked Mr. Holton—we told him who we were and asked him about the examination he had made of the different companies and he assured us that he had made them in good faith, and we asked him particularly in regard to the bond issue of the Diamond Sheet Mining Company and the Federal Development Company of Idaho. He had received for making of an examination of these properties, he told us $1500, and upon questioning him he admitted that he had not gone within possibly 100 miles of the mines but had made his report upon what a man had told him who claimed to be a mining expert. He also informed us that we—we asked him first when he had seen Mr. Cameron and I think he said the day before or a day or two before. Mr. Cameron and Mr. Donovan, his attorney, from Milwaukee, had been down and that he, Mr. Struckmeyer and Mr. Stirlen had a conference in this city.

I talked to him about the proposition of the Southern Land and Lumber Company and he told me that it was a good proposition, and that there was some good timber on the land, and when I informed him that I worked in the country and had driven across the tract of land, and knew something about it, and then he asked about the land in southern Louisiana.

the passage above has been quoted, it is sufficient to say that, as an entirety, the letter was competent to show the existence of the conspiracy and the conduct of such conspirators in furtherance thereof.[2] Had objection specifically been made to the line or two quoted that plaintiff in error complains of, and the Court had failed to pay attention to such objection, a question might be raised. But no such objection was specifically made. The objection was to the letter as an entirety, and the letter as an entirety was competent evidence to show a conspiracy, and what the conspirators were doing.

The judgment of the District Court is

Affirmed.

[2] January 8, 1906.

Mr. T. E. Cameron,
    Milwaukee, Wis.

Dear Sir:

Enclosed please find receipt in two trusteeships signed by me. I will step down to the law maker's office and get his receipt. I was down there a few minutes ago and he was out. I have been extremely busy for the past week, or you would have heard from me before. I had a case in court which occupied every minute of my time.

I have now secured a new trustee who fully understands the whole proposition and is O. K. in every respect. His name is John Stirlen, 98 Jackson Boulevard. He is a very bright, bold lawyer and an old friend of mine and is just the man we want. When you are down this way again I will take you over and introduce you to him. He has good looking offices at room 608 Monadnock Building.

Some man called on me Saturday and wanted to ask me a good many questions about Old Caney bond issue. He declined to tell me who he was, but he is undoubtedly some Chicago lawyer. I told him that it had come to me in the usual course of business, and that that was really all I knew about it. He asked me how much I received and I told him $350. I do not see how they can do anything about this, as we both did all we agreed to. In a matter of this kind, where there is a chance for disagreeable litigation, it seems to me that you might pay about ten per cent. on the face of the receipt, which would leave a balance due me of $25. What do you think about it?

Yours very truly,    F. K.

